UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Rudy Stanko,** | **Civil No. 08-4991 (JNE/JJG)** |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| **Ricardo Rios, Michael Nelley, Harley Lappin,** | |
| Respondents. | |

JEANNE J. GRAHAM, United States Magistrate Judge

This matter comes to the undersigned on a petition for a writ of habeas corpus (Doc. No. 1). Petitioner Rudy Stanko, currently incarcerated at the federal prison in El Reno, Oklahoma, is proceeding on his own behalf. The respondents, various correctional officials with the federal Bureau of Prisons (BOP), are represented by Tricia A. Tingle, Assistant U.S. Attorney. This litigation is referred for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1(a).

Mr. Stanko (Stanko) asserts that, under provisions of the recently passed Second Chance Act, he is entitled to home detention and to early placement at a halfway house.[1] In addition to raising concerns about whether these arguments are premature, the respondents answer that the Act does not grant Stanko an affirmative right to such placement. This Court will momentarily set aside the question about prematurity and begin by examining the Second Chance Act.

---

[1] Though various authorities use phrases such as "residential reentry centers," "community correctional centers," and "community correctional facilities," this Court will employ the term "halfway house" throughout this report, in the interests of clarity and uniformity.

**A.     The Second Chance Act:  Amendments to 18 U.S.C. § 3624(c)**

Stanko argues that he is entitled to twelve months' placement in a halfway house, as well as six months' home confinement, while serving his term of imprisonment.  One of the statutes he cites in support of this argument is 18 U.S.C. § 3624(c), which was recently amended by the Second Chance Act.  In relevant part, the amended statute provides,

> (1) . . . The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community.  Such conditions may include a community correctional facility.
>
> (2) . . . The authority under this subsection may be used to place a prisoner in home confinement for the shorter of ten percent of the term of imprisonment of that prisoner or six months.
>
> (3) . . . Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons [to direct the placement of prisoners under 18 U.S.C. §] 3621.
>
> . . . .
>
> (6) . . . The Director of the Bureau of Prisons shall issue regulations pursuant to this subsection no later than 90 days after the date of enactment of the Second Chance Act . . . which shall ensure that placement in a community correctional facility by the Bureau of Prisons is—
>
> > (A)     conducted in a manner consistent with section 3621(b) of this title;
> >
> > (B)     determined on an individual basis; and
> >
> > (C)     of sufficient duration to provide the greatest likelihood of successful reintegration into the community.

Stanko bases several arguments upon this subsection. One is that, pursuant to paragraphs (1) and (6), he should receive twelve months' placement in a halfway house. On a related point, Stanko contends that BOP officials issued a "clandestine memo" that violated this requirement. Another argument is that, under paragraph (2), he is entitled to six months' home confinement. Stanko further argues that he is entitled to expedited placement because, under paragraph (6), the BOP did not issue regulations in the time allowed.

### 1. Scope of Authority to Place in Halfway House

#### a. Statutory Analysis

Before discussing the scope of the BOP's authority to place prisoners in a halfway house, it is useful to consider some rules of statutory interpretation. If a statute is unambiguous, then a federal agency must comply with the clear language of the statute. But if a statute is ambiguous, and the agency advances an interpretation of the statute, that interpretation is usually entitled to some level of deference. Where an agency has yet to make a formal ruling that "carries the force of law" regarding the meaning of statutory language, the agency is given deference equal to its power to persuade. *Godinez-Arroyo v. Mukasey*, 540 F.3d 848, 850-51 (8th Cir. 2008); *Clark v. Dep't of Agriculture*, 537 F.3d 934, 939-40 (8th Cir. 2008).

Nothing in § 3624(c) expressly requires the BOP to place a prisoner in a halfway house. But paragraph (6) states that the BOP "shall ensure that placement in a community correctional facility . . . is . . . of sufficient duration to provide the greatest likelihood of successful reintegration into the community." At a minimum, this language implies the BOP should place prisoners in a halfway house for some period of time.

This ambiguity is enough to consider the persuasiveness of the respondents' position. Other than the clear twelve-month limit in paragraph (1), they argue that § 3624(c) and related

statutes grant the BOP wide discretion regarding when and whether to place prisoners in halfway houses. This position is highly persuasive for several reasons.

Paragraph (1) requires the BOP to "ensure that a prisoner . . . spends a portion of the final months . . . under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." The paragraph adds that these conditions "*may* include" a halfway house. Although paragraph (1) mandates "conditions" to facilitate reentry into the community, those conditions do not necessarily include placement in a halfway house. To the contrary, the word "may" indicates that the BOP has discretion to place prisoners in any facility. *See infra* at 8.

Paragraph (3) provides that § 3624(c) shall not be construed to limit the discretion of the BOP under 18 U.S.C. § 3621(b). And in turn, that statute provides that the BOP "may designate any available penal or correctional facility that meets minimum standards" as the place of imprisonment, considering factors that include the resources of the facility and the history of the prisoner. So even though the BOP has an obligation to facilitate prisoners' reentry into the community under § 3624(c), this obligation does not limit its discretion to place a prisoner in any facility under § 3621(b), whether that facility is a prison or a halfway house.

This discretion is reinforced through clause (6)(A) of § 3624(c), which contemplates that placement in a halfway house is "conducted in a manner consistent with" § 3621(b). And clause (6)(B) further directs that such placement be "determined on an individual basis." In light of the discretion signaled by these two clauses, it is doubtful that clause (6)(C) requires any particular duration in a halfway house, if such placement is required whatsoever.

As the BOP persuasively argues, if there is any ambiguity regarding its authority to place prisoners in halfway houses, the statutory scheme as a whole grants it wide discretion. Because

4

this interpretation is reasonable and persuasive, this Court must defer to it. In accordance with this interpretation, Stanko has no affirmative right to placement in a halfway house, or the twelve months' placement that he demands in his petition. On these points, his petition fails.

      **b.**      **The "Clandestine Memo"**

            **i.**      **Background**

Stanko also implies that BOP officials, through a "clandestine memo," violated § 3624(c) as amended by the Second Chance Act. According to Stanko, the memo directed prison officials to limit halfway house placements to no more than six months, in violation of the Act. Though Stanko does not identify the memo, he claims that it was revealed in an Eighth Circuit decision, *Miller v. Whitehead*. 527 F.3d 752 (8th Cir. 2008).

The relevant background can be traced back to the rules that existed before the passage of the Second Chance Act. At that time, halfway house placements were controlled in part by 28 C.F.R. § 570.21(a), which provided,

> The Bureau will designate inmates to [halfway houses] . . . during the last ten percent of the prison sentence being served, not to exceed six months.

Likewise, BOP Program Statement 7310.04 (1998) states,

> An inmate may be referred [to a halfway house] up to 180 days, with placement beyond 180 days highly unusual, and only possible with extraordinary justification.

The Second Chance Act then passed on April 9, 2008. Pub.L. 110-199, 122 Stat. 692. It directed the BOP to issue new regulations, pursuant to the amendments in § 3624(c), no more than ninety days following passage of the Act. 18 U.S.C. § 3624(c)(6).

Five days later, on April 14, 2008, the BOP issued a memorandum that addressed the effect of the Second Chance Act. It stated in relevant part,

5

> While the Act makes inmates eligible for a maximum of 12 months [in a halfway house], Bureau experience reflects inmates' pre-release [halfway house] needs can usually be accommodated by a placement of six months or less. Should staff determine an inmate's pre-release [halfway house] placement may require greater than six months, the Warden must obtain the Regional Director's written concurrence before submitting the placement to the Community Corrections Manager.

*See Strong v. Schultz*, — F.Supp.2d —, 2009 WL 485287 at *2 (D.N.J. 2009) (quoting this memorandum). This six-month threshold, therefore, was consistent with the limits that existed under § 570.21(a) and the Policy Statement.

The BOP did not issue interim regulations, pursuant to § 3624(c), until October 21, 2008. Under these regulations, § 570.21(a) was wholly revised and it now states,

> Inmates may be designated to [halfway houses] as a condition of pre-release custody and programming during the final months of the inmate's term of imprisonment, not to exceed twelve months.

Pre-Release Community Confinement, 73 Fed. Reg. 62,440, 64,443 (Oct. 21, 2008). The new rule apparently sets aside the six-month threshold and, pursuant to 18 U.S.C. § 3624(c)(1), only acknowledges the twelve-month limit expressly provided under the Second Chance Act.

The respondents represent that they are now applying the revised version of § 570.21(a). They do not expressly say, however, whether they are still applying the April 14 memorandum or the Program Statement.

Because the April 14 memorandum issued in lieu of the formal regulations required under the Second Chance Act, it is reasonable to infer that the memorandum was superseded by the revision of § 570.21(a) on October 21. But the Program Statement has not been revised to correspond with the new regulation. For this reason, this Court cannot ascertain whether the BOP has wholly abandoned a six-month threshold for the duration of halfway house placements.

### ii.     *Miller* and the "Clandestine Memo"

As mentioned at the outset, Stanko contends that the clandestine memo was disclosed in the *Miller* decision.  To determine precisely what Stanko is referring to, this Court looks to that decision.

The *Miller* decision did not directly consider the Second Chance Act, and instead focused on 18 U.S.C. § 3621(b).  527 F.3d at 756-57.  As discussed beforehand, this statute generally grants the BOP discretion to place a prisoner in any prison or correctional facility, whether or not the facility is a halfway house.  The question before the *Miller* court was whether the six-month threshold, in the Program Statement, violated the discretion granted under § 3621(b).  *Id.*

Contrary to what Stanko contends, the *Miller* decision does not identify any clandestine memo.  But the decision does allude to the April 14 memorandum.  527 F.3d at 757 & n. 4.  As both the Program Statement and the April 14 memorandum include a six-month threshold, either document might be the clandestine memo Stanko refers to.  Even if the April 14 memorandum was superseded by the revision of § 570.21, this Court will assume for the sake of argument that both the memorandum and the Program Statement remain in effect.

If so, the analysis is controlled by the *Miller* decision.  It began by observing that the Program Statement allows halfway house placements beyond six months upon "extraordinary justification."  It also observed that, under § 3621(b), there are several factors the BOP considers when exercising its discretion to place prisoners.  The underlying issue, therefore, was whether the "extraordinary justification" standard was in conflict with the statutory factors that governed the BOP's exercise of discretion.  *Id.* at 757-58.

The *Miller* court ruled that the Program Statement did not violate the statute.  It reasoned that "extraordinary justification," by itself, does not supply particular factors or constrain the

7

BOP's discretion. As a result, the *Miller* court determined, the Program Statement only supplies a guideline that the BOP uses when exercising its discretion. *Id.* at 757-58.

As this discussion indicates, the *Miller* decision did not consider the relationship between the Program Statement and the Second Chance Act. But as this Court previously determined, 18 U.S.C. § 3624(c), as amended by the Second Chance Act, does not disturb the discretion granted to the BOP under § 3621(b). *See* 18 U.S.C. § 3624(c)(3). Because the Program Statement does not violate § 3621(b), the Program Statement cannot violate § 3624(c) either. As a result, the Program Statement and the Second Chance Act are not in conflict, and Stanko's argument fails.

The analysis is the same for the April 14 memorandum. It supplies a six-month threshold that is substantially identical to that in the Program Statement. If the Program Statement does not violate the Second Chance Act, neither can the April 14 memorandum.

### 2. Authority to Place in Home Confinement

Stanko further argues that, pursuant to § 3624(c)(2), he is entitled to six months' home confinement. But the statute unambiguously indicates that the BOP "*may* . . . place a prisoner in home confinement[.]"

By using the permissive word "may," this statute grants the BOP discretion to decide whether a prisoner receives home confinement. And this authority includes the discretion to deny home confinement. *Cf. Lopez v. Davis*, 531 U.S. 230, 241 (2001) (ruling that "may," in another statute governing the BOP's authority to determine conditions of confinement, granted discretion and did not mandate particular action). For this reason, § 3624(c)(2) does not give Stanko any cause for relief.

### 3.     Timeliness of Regulations

Stanko also contends that he should receive expedited placement because the BOP did not issue regulations in the time required by the Second Chance Act. Pursuant to § 3624(c)(6), the BOP was directed to issue regulations under the remainder of § 3624(c) no later than ninety days after the Act was passed. Because the Act was passed on April 9, 2008, but the regulations did not issue until October 21, 2008, the regulations were approximately three months late.

The respondents suggest that this argument is immaterial. They contend that Stanko will not qualify for placement in a halfway house for years. So even if the new regulations are three months late, they imply, the new regulations nevertheless will be timely and properly applied to Stanko.

The record indicates that Stanko was imprisoned for three offenses. He received seventy-two months' imprisonment for two counts of illegal possession of firearms. *United States v. Stanko*, 491 F.3d 408, 411 (8th Cir. 2007) (*Stanko I*). He received another year, on a separate count, for providing a false social security number. *See United States v. Stanko*, 528 F.3d 581, 584 (8th Cir. 2008) (*Stanko II*). The firearms offenses were affirmed on appeal, but the social security offense has since been reversed for new trial. *Stanko II*, 528 F.3d at 582; *Stanko I*, 419 F.3d at 419.

Prior to the appeals, BOP officials projected that Stanko would be eligible for release in May 2012. After the social security offense was reversed—and assuming that Stanko would be acquitted of this offense—BOP officials then estimated that Stanko would be released no sooner than June 2011. (*See* Decl. of A. Beuge, Dec. 4, 2008 at 2 & Exh. D (Resp. of H. Watts, Nov. 7, 2008); Pet. of R. Stanko, Exh. (Resp. of R. Rios, July 18, 2008).)

The BOP represents that it determines halfway house eligibility seventeen to nineteen months before a prisoner's projected release. (Resps.' Mem., Dec. 11, 2008, at 5.) With this timeframe, and an estimated release date in June 2011, Stanko will receive his halfway house evaluation between November 2010 and January 2011.

The BOP was required to issue new regulations in July 2008, but they did not do so until October 2008. If evaluated for halfway house placement during this timeframe, there might be injury to a prisoner who did not have the benefit of the new regulations. But Stanko will not be evaluated until late 2010, and when he is evaluated, it will be in accordance with the regulations issued under the Second Chance Act. He suffers no injury from the late regulations, and for this reason, Stanko is not entitled to any relief here.

**B.    The Second Chance Act:  Pilot Program for Home Detention of Elderly Offenders**

Stanko also cites a pilot program under the Second Chance Act. This program allows the BOP to select prisons where qualifying elderly offenders will be allowed to serve the remainder of their sentences in home detention. 42 U.S.C. § 17541(g)(1). But only prisoners over sixty-five years old, who meet other qualifications, are eligible. 42 U.S.C. 17541(g)(5). Stanko argues this program is unconstitutional because it violates equal protection and it is a bill of attainder, and as a result, he should be admitted into the program and placed in home detention.

This Court briefly addressed this issue earlier in this litigation, in an order on August 28, 2008. Should the pilot program be declared unconstitutional, this Court observed, it would not affect the fact or duration of Stanko's confinement. That reasoning remains applicable now. If the program is unconstitutional, then it would end and *no* prisoners participate. The remedy is not admission of other, nonqualifying prisoners like Stanko into the program. For these reasons, Stanko cannot obtain any relief here.

Even if this Court were to reach the merits, the outcome is no different. In the context of equal protection, the initial issue is whether the statute involves a protected class or fundamental right. If not, the statute is subject to rational basis review, meaning there is no violation so long as there is a plausible public policy that supports the classification. *Hawkeye Cmdy. Promotions, Inc. v. Vilsack*, 486 F.3d 430, 442 (8th Cir. 2007).

No protected class, such as race or sex, is involved here. Stanko challenges the program because it distinguishes prisoners on the basis of age, but this sort of classification is subject to rational basis review. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313-14 (1976). No fundamental right, moreover, attaches to a discretionary privilege such as placement in home detention. *Cf. Mahfouz v. Lockhart*, 826 F.2d 791 (8th Cir. 1987) (applying rational basis review to state statute that governed prisoners' eligibility for work release program).

The purpose of the program is to see whether elderly offenders can be placed in home confinement in an inexpensive manner that preserves public safety. The statute reasonably and plausibly limits the program to elderly offenders, who may be expected to pose a smaller threat to public safety, and who might create greater costs if they stay in the general prison population. Because the statute has a rational basis, it does not violate equal protection.

Stanko also suggests that the program is an unconstitutional bill of attainder. Such a bill occurs, in violation of Article I, § 9 of the U.S. Constitution, where a legislative act punishes a particular person or group without trial. The rationale is that, because trial and punishment are committed to judicial process, Congress cannot usurp the judicial role by inflicting punishment directly. *United States v. Van Horn*, 798 F.2d 1166, 1168 (8th Cir. 1986).

If a statute withholds a benefit or privilege, the statute does not implicate punishment and cannot be a bill of attainder. *Jensen v. Heckler*, 766 F.2d 383, 386 (8th Cir. 1985). The program

11

at issue here creates a privilege, home placement, for certain elderly prisoners. As a result, the underlying statute cannot be a bill of attainder.

**B.     Standing and Ripeness**

The respondents argue, in part, that Stanko's petition is premature. This position is based on the fact, noted beforehand, that Stanko will not even be considered for placement in a halfway house until late 2010. But the respondents do not explain why this fact should be significant or how it affects an analysis of the petition.

Perhaps the closest relevant doctrine is that of constitutional standing. This doctrine is derived from Article III of the U.S. Constitution, which limits federal courts to hearing "cases" and "controversies." To establish standing, the party seeking relief must establish that it suffered an actual injury, traceable to the conduct of the adverse party, that is redressable by a favorable court decision. One purpose of the standing requirement is to prevent hypothetical or speculative decisions that afford no true relief. *Public Water Supply Dist. No. 8 v. City of Kearney*, 401 F.3d 930, 932 (8th Cir. 2005); *Shain v. Veneman*, 376 F.3d 815, 817-18 (8th Cir. 2004).

A related principle, derived from the constitutional rule of standing, is that of ripeness. It limits federal courts from considering issues prematurely, particularly where a court decision has the potential to interfere with the policies of government agencies. As a general rule, a dispute is not ripe where it depends upon events that may not occur as anticipated or may not occur at all. *Minnesota Public Utilities Comm'n v. Fed. Communications Comm'n*, 483 F.3d 570, 582-83 (8th Cir. 2007).

Because standing and ripeness doctrines are derived from the constitution, and because they implicate the jurisdiction of the court, a court may consider these issues on its own initiative at any time. *See Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1156-57 (8th Cir.

2008). Although they frame their argument as one about "prematurity," the respondents create sufficient concern about standing to merit some discussion about it here.[2]

For most of the issues under § 3624(c), there is enough information to permit an informed ruling about a concrete dispute. The sole exception is the issue involving the timeliness of new regulations under the Second Chance Act. For this issue, Stanko does not establish any concrete injury, since the old regulations plainly will not be applied to him. And without an injury, this Court also lacks the means to redress it. Under these circumstances, Stanko has no standing to pursue habeas relief on this particular issue.

For the issues arising out of the pilot program for home detention of elderly offenders, the respondents contend that they have yet to implement such a program, and thus Stanko's habeas challenge is premature. This Court generally agrees that, until this program is actually applied to some prisoners, litigation on this issue may be unripe. But the preceding analysis illustrates that an informed analysis is possible, and because the respondents prevail nonetheless, there is no interference with the policies of the BOP.

To the extent that Stanko either lacks standing, or advances issues that are unripe, these concerns do not affect the outcome here: Stanko is not entitled to habeas relief in any case. In accordance with the preceding analysis, this Court recommends that Stanko's petition for a writ of habeas corpus be denied in its entirety.

---

[2]   Few cases have considered how standing or ripeness applies in the context of petitions for habeas corpus. Consistent with the underlying purposes of habeas, these cases at best show that there must be some impact on the fact or duration of confinement, and that release is not so many years distant that relief is speculative. *See Burkey v. Marberry*, 556 F.3d 142, 147-48 (3d Cir. 2009) (finding no standing where prisoner was released and had no real stake in the outcome); *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005) (per curiam) (concluding that habeas petition was unripe where prisoner was not eligible for release for another seven years). Because these cases do not supply particular guidance, this Court relies on general Eighth Circuit case law regarding standing and ripeness.

### III. CONCLUSION

18 U.S.C. § 3624(c), as amended by the Second Chance Act, does not require prisoners to be placed in halfway houses, or in home detention, for a particular period of time. The amended statute recognizes the BOP's discretion to determine where prisoners are placed, whether in a prison or a halfway house.

Assuming the BOP issued a "clandestine memo" with a six-month limitation on halfway house placements, such a limitation is consistent with the BOP's discretion and does not violate § 3624(c) either.

Assuming the BOP violated the Second Chance Act by not issuing new regulations in the time required under § 3624(c), new regulations have since issued and will be properly applied to Stanko. As a result, Stanko suffers no injury from the violation and is not entitled to any relief on this basis.

Turning to the pilot program under the Second Choice Act for home detention of elderly offenders: If this program is unconstitutional, the remedy is invalidation of the program. So if Stanko did not qualify for the program beforehand, the alleged unconstitutionality of the program cannot confer a right to participate in the program. This issue, therefore, does not grant Stanko cause for relief.

In summary, Stanko has not identified any provisions under the Second Chance Act that alter the fact or duration of his imprisonment. This Court accordingly concludes that his petition for a writ of habeas corpus should be denied.

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.  Stanko's petition for a writ of habeas corpus (Doc. No. 1) be **DENIED.**

2. This litigation be dismissed in its entirety and judgment entered.

Dated this 31st day of March, 2009.         /s   *Jeanne J. Graham*

JEANNE J. GRAHAM  
United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **April 14, 2009**. A party may respond to the objections within ten days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words. The district court judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.